OPINION *Page 2 
{¶ 1} Defendant-appellant Nancy L. Stout appeals her conviction for OVI and her administrative license suspension entered by the Licking County Municipal Court. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On January 5, 2007, Appellant was involved in an automobile accident, and was subsequently charged with OVI and issued an administrative license suspension. Appellant filed motions to suppress the field test and the BAC test, in addition to an administrative license suspension appeal.
 {¶ 3} On March 1, 2007, the trial court conducted a hearing on the motions to suppress. At the hearing Trooper Eitel of the Ohio State Highway Patrol testified relative to his investigation of an automobile accident in which Appellant was driving. Appellant claims a deer crossing the road in front of her vehicle caused the accident. Trooper Eitel stated he was dispatched to the accident at approximately 8:07 p.m. and arrived at the scene at 8:29 p.m. Appellant informed Trooper Eitel the accident occurred approximately ten to fifteen minutes before he got the dispatch call.
 {¶ 4} Trooper Eitel testified he conducted standardized field sobriety tests on Appellant. Trooper Eitel testified he did not have appellant remove her eyeglasses before conducting the test.
 {¶ 5} Appellant was then transported to the Utica Police Department where she submitted to a breath test on the BAC DataMaster at 9:47 p.m. Sergeant Kofod of the Utica Police Department conducted the test. Appellant tested at .121 grams of alcohol per 210 liters of breath. *Page 3 
 {¶ 6} Via Judgment Entry of March 5, 2007, the trial court overruled the motions to suppress. Appellant subsequently entered a plea of no contest to one count of failure to control and one count of OVI in violation of R.C. 4511.19(A)(1)(d). The trial court found Appellant guilty of the charges, and sentenced Appellant accordingly.
 {¶ 7} Appellant now appeals, assigning as error:
 {¶ 8} "I. TRIAL COURT COMMITED [SIC] HARMFUL ERROR WHEN IT DID NOT SUPPRESS THE HORIZONTAL GAZE TEST DUE TO THE OFFICER NOT CONDUCTING THE TESTS IN SUBSTANTIAL COMPLIANCE WITH THE NATIONAL HIGHWAY AND TRAFFIC SAFETY MANUAL.
 {¶ 9} "II. THE TRIAL COURT COMITTED [SIC] HARMFUL ERROR IN NOT EXCLUDING THE BAC DATAMASTER TEST RESULTS.
 {¶ 10} "III. THE TRIAL COURT ERRED IN NOT GRANTING APPELLANT'S ADMINISTRATIVE LICENSE SUSPENSION APPEAL."
 {¶ 11} First, we note there are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. See: State v.Fanning (1982), 1 Ohio St.3d 19, 437 N.E .2d 583; State v. Klein (1991),73 Ohio App.3d 486, 597 N.E.2d 1141, State v. Guysinger (1993),86 Ohio App.3d 592, 621 N.E.2d 726. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See: State v. Williams (1993),86 Ohio App.3d 37, 619 N.E.2d 1141. Finally, assuming the trial court's findings of fact are *Page 4 
not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry (1994), 95 Ohio App.3d 93, 96,641 N.E.2d 1172, State v. Claytor (1993), 85 Ohio App.3d 623, 627, 620 N.E.2d 906,908, and State v. Guysinger (1993), 86 Ohio App.3d 592, 594,621 N.E.2d 726.
 {¶ 12} In a motion to suppress, the trial court assumes the role of trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate witness credibility. Guysinger, supra, at 594, citations omitted. Accordingly, an appellate court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Id., citation omitted.
 I. {¶ 13} In the first assignment of error, Appellant argues the trial court erred in not suppressing the Horizontal Gaze Test due to the officer not conducting the test in substantial compliance with the National Highway and Traffic Safety Manual.
 {¶ 14} In State v. Boczar (2007), 113 Ohio St.3d 148, the Ohio Supreme Court held:
 {¶ 15} "For the foregoing reasons, this court holds that R.C. 4511.19(D)(4)(b), which provides that the results of field sobriety tests are admissible when the tests are administered in substantial compliance with testing standards, is constitutional. Further, we hold that HGN test results are admissible in Ohio without expert testimony so long *Page 5 
as the proper foundation has been shown both as to the administering officer's training and ability to administer the test and as to the actual technique used by the officer in administering the test."
 {¶ 16} Specifically, Appellant cites page VIII-6 of the manual, which reads:
 "Specific Procedures {¶ 17} "If the subject is wearing glasses, have them removed."
 {¶ 18} Further, page VIII-15 indicates,
 {¶ 19} "Taking Field Notes on Horizontal Gaze Nystagmus Test
 {¶ 20} * * *
 {¶ 21} "First, have subject remove glasses."
 {¶ 22} At the suppression hearing, Trooper Eitel testified:
 {¶ 23} "Q. Okay, and did you give Miss Stout instructions on how to perform that test?
 {¶ 24} "A. Yes I did.
 {¶ 25} "Q. And what did you tell Miss Stout?
 {¶ 26} "A. Well, first I asked her, because she wore, she wears contac [sic]. . .or corrective lenses. I asked her if she could see without those glasses, approximately fifteen inches in front of her face. She indicated to me that she couldn't, so I had to do the test with her glasses on. I asked, and while doing that test, while looking at her, you know, I made sure that her pupils were equal and reactive and made sure that she could follow the pen.
 {¶ 27} "Q. Okay, and that was with her glasses on?
 {¶ 28} "A. Yes. *Page 6 
 {¶ 29} "Q. And when you're conducting those tests, do you do it in strict compliance with your training with the NHTSA manual and ADAP program?
 {¶ 30} "A. Yes.
 {¶ 31} "Q. And specifically when you're talking about strict compliance with the NHTSA, you're referring to the 2000 manual?
 {¶ 32} "A. Yes.
 {¶ 33} "* * *
 {¶ 34} "Q. Now you stated that you went ahead and started off with the HGN, correct?
 {¶ 35} "A. Correct.
 {¶ 36} "Q. And she was wearing glasses and really couldn't see the pen without her glasses on, correct?
 {¶ 37} "A. Correct.
 {¶ 38} "Q. And the HGN's not on the videotape either, correct?
 {¶ 39} "A. Correct.
 {¶ 40} "Q. Now, you were trained underneath the 2000 manual?
 {¶ 41} "A. Yes.
 {¶ 42} "Q. And that was the last training course you went through that was certified (inaudible)?
 {¶ 43} "A. Correct.
 {¶ 44} "Q. This is your Exhibit One. As it states underneath here in the NHTSA training manual, under Specific Training Procedures, it states that `If a suspect is wearing eyeglasses, have them removed." Correct? *Page 7 
 {¶ 45} "A. Yes it does.
 {¶ 46} "Q. Okay, so according to the NHTSA manual, if they have eyeglasses, you're supposed to have them removed, correct.
 {¶ 47} "A. It would be kind of hard to do the test, if they can't see the pen.
 {¶ 48} "Q. Right, understandable, so it might be just a test that you can't do on an individual that can't see very well, correct?
 {¶ 49} "A. I disagree.
 {¶ 50} "Q. You disagree with the rules set forth in the NHTSA manual that you're supposed to have the subject remove eyeglasses?
 {¶ 51} "A. Yes.
 {¶ 52} "Q. But it does state that clearly in the manual, correct?
 {¶ 53} "A. Yes it does.
 {¶ 54} Tr. at 12-13; 41-43.
 {¶ 55} Upon review, we find Trooper Eitel failed to conduct the Horizontal Gaze Nystagmus Test in substantial compliance with the manual. However, we note Appellant plead guilty to both operating a vehicle while under the influence of alcohol, in violation of R.C. 4511.09(A)(1) and operating a vehicle with a concentration of .08 of one gram or more by weight of alcohol per 210 liters of breath, in violation of R.C. 4511.19(A)(1)(d). Therefore, we must first determine whether probable cause existed to arrest Appellant independent of consideration of the HGN test, and if so, then whether the trial court relied upon the HGN test in rendering its verdict following Appellant's no contest pleas.
 {¶ 56} Trooper Eitel testified at the suppression hearing: *Page 8 
 {¶ 57} "Q. Okay, while you were talking to Miss Stout, did you notice anything about her person?
 {¶ 58} "A. While talking to her, at first I didn't notice anything. When I was talking to her, I noticed that her eyes were bloodshot and I could smell a strong odor of alcoholic beverage on her breath.
 {¶ 59} "Q. Okay, at any point when you were discussing that with her, did you ask her if she had consumed any alcohol that evening?
 {¶ 60} "A. Yes I did.
 {¶ 61} "Q. And what was her response?
 {¶ 62} "A. She said, `no'.
 {¶ 63} "Q. And that was her initial response to you?
 {¶ 64} "A. Yes.
 {¶ 65} "Q. What did you do next, Trooper?
 {¶ 66} "A. I had her come back to my car and we did some things, took some photographs and things of the scene and did our crash investigation. Then I had her step out of the vehicle and told her that I was going to check to make sure she was okay to be driving.
 {¶ 67} "Q. Okay, Trooper Eitel, at that point, did Miss Stout indicate that there were any other cars involved?
 {¶ 68} "A. No.
 {¶ 69} "Q. Okay, she simply said that she was swerving to miss a deer?
 {¶ 70} "A. Correct. *Page 9 
 {¶ 71} "Q. Okay, and then you said that you requested that she do some field sobriety tests?
 {¶ 72} "A. Yes.
 {¶ 73} "Q. And what was the basis for that request?
 {¶ 74} "A. Just the fact that, well, we got a crash, a single-car crash that was on a curve, and the fact that I could smell a strong odor of an alcoholic beverage on her breath and the bloodshot eyes, and the fact that she said she hadn't been drinking, but I could smell it.
 {¶ 75} "* * *
 {¶ 76} "A. At that point, you know, well I had her take a portable breath test.
 {¶ 77} "Q. Okay, and after that, what did you do?
 {¶ 78} "A. Then I placed her under arrest for OVI.
 {¶ 79} "Q. Okay, and why did you place her under arrest at that time?
 {¶ 80} "A. Based on all the, of everything I saw, observed, smelled, the strong odor of alcoholic beverage on her breath, the bloodshot eyes, and based on my field sobriety tests.
 {¶ 81} "Q. Did you also factor into that, that there was a traffic accident?
 {¶ 82} "A. Yes."
 {¶ 83} Tr. at 10-11; 20-21.
 {¶ 84} Based upon the above, although Trooper Eitel did not conduct the HGN test in substantial compliance with the manual, we find there were other indicia of intoxication sufficient to establish probable cause for Appellant's arrest.
 {¶ 85} The first assignment of error is overruled. *Page 10 
 II {¶ 86} In the second assignment of error, Appellant asserts the trial court erred by not excluding the BAC Datamaster Results.
 {¶ 87} In State v. Carter (March 8, 1999), Licking App. No. 98CA00131, this Court held before the results of a breathalyzer test may be admitted into evidence, the State must show (1) the instrument was in proper working order; (2) its operator had the proper qualifications to conduct the test; and (3) the test was conducted in substantial compliance with the Ohio Department of Health regulations. See:Cincinnati v. Sand (1975), 43 Ohio St.2d 79, 330 N.E.2d 908; Newark v.Lucas (1988), 40 Ohio St.3d 100, 532 N.E.2d 130. When a motion to suppress is predicated on non-compliance with Department of Health regulations, the burden is on the State to prove compliance with said regulations. See: State v. Crowder and Wright (Nov. 30, 1995), Morgan App. Nos. CA-95-14 and CA-95-15, unreported.
 {¶ 88} Appellant argues the State failed to establish the sample was collected within the appropriate time period pursuant to R.C. 4511.19(D). Specifically, Appellant states the State failed to establish the BAC test was conducted prior to the expiration of the time limit set forth in R.C. 4511.19
 {¶ 89} Initially, we note, R.C. 4511.10(D) was amended effective August 17, 2006. The current version of the statute requires the breath test be conducted within three hours of the alleged violation, in contrast to the pre-amended version which set forth a two hour time limit.
 {¶ 90} Upon review of the record, Trooper Eitel testified at the suppression hearing: *Page 11 
 {¶ 91} "A. I talked to Miss Stout and advised her of her rights. I asked her, you know, what had happened. She said that she swerved to miss a deer and went off the road. We talked about the fact that she had left the scene and come back. She, I guess she just lives a couple miles from the crash sight, so I established a time of around 8:00, that we were agreeable on.
 {¶ 92} "Q. So did you discuss with her when the crash occurred?
 {¶ 93} "A. Correct.
 {¶ 94} "Q. Okay, in reference to when you were standing there on the scene?
 {¶ 95} "A. Correct.
 {¶ 96} "Q. And how long did she indicate before that, the crash occurred?
 {¶ 97} "A. Just a matter of a few minutes. Not more than ten minutes. Like I said, she had, you know, I guess it was Blacksnake, I believe. The road that she lives off of, which is just right up the road."
 {¶ 98} Tr. at 9.
 {¶ 99} Later in his testimony at the suppression hearing, Trooper Eitel states he collected the breath sample from Appellant at 9:47p.m. Accordingly, we find the State established by competent and credible testimony the breath test was conducted within the three-hour time limit required by 4511.19(D).
 {¶ 100} Appellant further asserts the State failed to demonstrate the Utica Police Department kept a manual in the area where the tests are performed, as required by the manual.
 {¶ 101} Ohio Administrative Code Section 3701-53-01, provides: *Page 12 
 {¶ 102} "(B) At least one copy of the written procedure manual required by paragraph (D) of rule 3701-53-06 of the Administrative Code for performing blood, urine, or other bodily substance tests shall be on file in the area where the analytical tests are performed (Emphasis added).
 {¶ 103} "In the case of breath tests using an approved evidential breath testing instrument listed in paragraphs (A) and (B) of rule 3701-53-02 of the Administrative Code, the operational manual provided by the instrument's manufacturer shall be on file in the area where the breath tests are performed."
 {¶ 104} Upon review of the record, Sgt. Kofod testified at the suppression hearing:
 {¶ 105} "Q. Do you keep this manual, this ODH manual in your Datamaster room?
 {¶ 106} "A. I don't believe there's a copy of this manual in the room, but we have a copy in the office with the rest of our books.
 {¶ 107} "Q. Okay, but you do keep a copy of the Datamaster Guide, some form of the Datamaster Guide, correct?
 {¶ 108} "A. Correct, yes.
 {¶ 109} "Q. And that does appear to be accurate, what you looked at?
 {¶ 110} "A. Yes it does."
 {¶ 111} Tr. at 77-78.
 {¶ 112} We recognize the language of the regulation concerning where the operational manual is to be kept is mandatory: "the operational manual provided by the instrument's manufacturer shall be on file in the area where the breath tests are performed." However, while the regulation provides the manual must be kept in the "area" where the tests are performed, it does not require an exact proximity. *Page 13 
Accordingly, we find the State established the department substantially complied with the ODH requirements, and the trial court properly relied on the validity of the test results.
 {¶ 113} Appellant further asserts the State failed to demonstrate Sgt. Kofod conducted the test following the proper procedure with regard to the instrument simulator checks set forth in the manufacturer's manual and the Ohio Department of Health Bureau of Alcohol and Drug Testing Basic Training BAC DataMaster manual.
 {¶ 114} Appellant cites this Court's opinion in State v.Schlegel, 2004-Ohio-2535, holding:
 {¶ 115} "Appellant submits, and the State concedes, that the Department of Health Bureau of Alcohol and Drug Testing BAC Datamaster machine's training manual allows for a margin of error of no more than .003 on the second air blank test.
 {¶ 116} "The State argues that absolute compliance with such regulation is not required for such results to be deemed admissible. They further argue the results of the second air blank tests should not invalidate the BAC results because the initial blank test registered .000, showing that no residual alcohol was in the machine prior to Appellant taking such BAC test.
 {¶ 117} "Upon review, we find that the language contained in the manual with regard to the margin is mandatory language in that it states: "A second air blank test if performed showing that the sample has been purged out. The reading on the air blank must be .003 orless." (Emphasis added).
 {¶ 118} "As the reading for the second air blank in the case sub judice was outside of the allowable margin of error, we must assume that the machine was not functioning *Page 14 
properly according [sic] the guidelines provided by the Ohio Department of Health. Based on such irregularity, such test results must necessarily be thrown out as such does not comply with the mandatory regulations.
 {¶ 119} "We find that the trial court erred in failing to suppress the BAC test results as such were not administered in accordance with Department of Health Regulations."
 {¶ 120} We are now called upon to reconsider this issue. As set forth above, Ohio law requires the State must show (1) the instrument was in proper working order; (2) its operator had the proper qualifications to conduct the test; and (3) the test was conducted in substantial compliance with the Ohio Department of Health regulations. We hold it is within the sole authority and discretion of the Ohio Department of Health to determine the guidelines necessary to establish whether the machine is in proper working order. We find any other ancillary manuals, including the manufacturer's manual, are advisory only and not required unless and until adopted by the Ohio Department of Health.
 {¶ 121} In the case sub judice, evidence offered at the suppression hearing demonstrates both the officer conducting the calibration checks and the trooper administering the test were certified as ODH Senior Operators. Sgt. Kofod testified he conducted his calibration checks of the BAC machine at the Utica Police Department before and after Appellant's test in compliance with his training from ODH. Sgt. Kofod followed the BAC Datamaster Instrument Check Form when he conducted both of the calibration checks relevant to Appellant's test. He verified and checked the appropriate boxes pertaining to the simulator temperature being at 34 degrees plus or minus .2 degrees. Sgt. Kofod testified the calibration checks were found to be within the margin *Page 15 
of error listed in the Ohio Department of Health regulations. Accordingly, the trial court did not err in allowing the State to introduce the BAC Datamaster results.
 {¶ 122} The second assignment of error is overruled.
 III. {¶ 123} In the final assignment of error, Appellant argues the trial court erred in not granting Appellant's Administrative License Suspension appeal.
 {¶ 124} Initially, we note, R.C. 4511.97(C) limits the scope of an ALS appeal. The statute reads:
 {¶ 125} "(C) If a person appeals a suspension under division (A) of this section, the scope of the appeal is limited to determining whether one or more of the following conditions have not been met:
 {¶ 126} "(1) Whether the arresting law enforcement officer had reasonable ground to believe the arrested person was operating a vehicle, streetcar, or trackless trolley in violation of division (A) or (B) of section 4511.19 of the Revised Code or a municipal OVI ordinance or was in physical control of a vehicle, streetcar, or trackless trolley in violation of section 4511.194 of the Revised Code or a substantially equivalent municipal ordinance and whether the arrested person was in fact placed under arrest;
 {¶ 127} "(2) Whether the law enforcement officer requested the arrested person to submit to the chemical test or tests designated pursuant to division (A) of section 4511.191 of the Revised Code;
 {¶ 128} "(3) Whether the arresting officer informed the arrested person of the consequences of refusing to be tested or of submitting to the test or tests;
 {¶ 129} "(4) Whichever of the following is applicable: *Page 16 
 {¶ 130} "(a) Whether the arrested person refused to submit to the chemical test or tests requested by the officer;
 {¶ 131} "(b) Whether the arrest was for a violation of division (A) or (B) of section 4511.19 of the Revised Code or a municipal OVI ordinance and, if it was, whether the chemical test results indicate that the arrested person's whole blood contained a concentration of eight-hundredths of one per cent or more by weight of alcohol, the person's blood serum or plasma contained a concentration of ninety-six-thousandths of one per cent or more by weight of alcohol, the person's breath contained a concentration of eight-hundredths of one gram or more by weight of alcohol per two hundred ten liters of the person's breath, or the person's urine contained a concentration of eleven-hundredths of one gram or more by weight of alcohol per one hundred milliliters of the person's urine at the time of the alleged offense.
 {¶ 132} "(D) A person who appeals a suspension under division (A) of this section has the burden of proving, by a preponderance of the evidence, that one or more of the conditions specified in division (C) of this section has not been met. * * *"
 {¶ 133} The statute does not require the termination of an ALS based on defects in the BMV 2255.
 {¶ 134} R.C. 4511.191(D)(2) provides:
 {¶ 135} "The sworn report of an arresting officer completed under division (D)(1)(c) of this section shall be given by the officer to the arrested person at the time of the arrest or sent to the person by regular first class mail by the registrar as soon thereafter as possible, but no later than fourteen days after receipt of the report. An arresting officer may give an unsworn report to the arrested person at the time of the arrest *Page 17 
provided the report is complete when given to the arrested person and subsequently is sworn to by the arresting officer. As soon as possible, but no later than forty-eight hours after the arrest of the person, the arresting officer shall send a copy of the sworn report to the court in which the arrested person is to appear on the charge for which the person was arrested."
 {¶ 136} Appellant cites State v. Frame (May 24, 1999), Morrow App. No. CA 881, in which this Court held the sending of a copy of the sworn report to the court is a mandatory requirement. The statute uses the term "shall" and does not allow for an arresting officer's authentication of the BMV Form 2255 at an ALS appeal hearing as a substitute for the actual sending of the document.
 {¶ 137} Appellant argues Trooper Eitel did not sign the form in front of the Deputy Clerk of Court and he was not sworn in by the Deputy Clerk of Court when he signed it. On Sunday, January 7, 2007, two days after the arrest, the Deputy Clerk of Court signed the form without the officer being present. On January 8, 2007, at 9:28 a.m. the document was file stamped in the trial court.
 {¶ 138} Upon review of the testimony presented at the suppression hearing, Trooper Eitel testified he completed the BMV 2255 at the scene of the accident and Trooper Neely signed the form as a witness.
 {¶ 139} "Q. Where'd you get it notarized? Where'd you do it? How did it go down?
 {¶ 140} "A. The form was notarized by our dispatcher at the Post.
 {¶ 141} "Q. It looks like this is a copy of . . . did you end up bringing this down to Court? Getting it filed?
 {¶ 142} "A. Other than like we usually do it. Put it in the Court mail and . . . *Page 18 
 {¶ 143} "Q. Someone takes it down? A trooper takes it down?
 {¶ 144} "A. Correct."
 {¶ 145} Tr. at 44-45.
 {¶ 146} Trooper Eitel then had the BMV 2255 notarized, and forwarded a copy to the BMV and the trial court. The arrest at issue took place on Friday evening, and the paperwork could not be filed with the trial court until Monday morning. This case is distinguishable fromFrame in that Trooper Eitel forwarded a notarized copy of the BMV 2255, which was filed on the earliest possible date with the trial court.
 {¶ 147} Appellant's third assignment of error is overruled.
 {¶ 148} The judgment of the Licking County Municipal Court is affirmed.
 Hoffman, P.J., Gwin, J. and Wise, J. concur. *Page 19 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Licking County Municipal Court is affirmed. Costs assessed to Appellant. *Page 1